1810.

Sunbury,
Monday,
June 11.

### Lessee of DUNCAN *against* CURRY and Others.

*Between two applications of the 3d April 1769, that which came out of the wheel first, and was lowest in number, has the preference.*

*It is a matter of fact for the jury to decide which of two applications is most descriptive of the land in dispute, or whether either applies to it.*

*An application descriptive of the land, is to be preferred to one not descriptive of it, though such descriptive application is higher in number, provided due diligence is used in obtaining a survey.*

*If the holder of the preferable application does not put it into the surveyor's hands, and the holder of the inferior application does, the surveyor may make the survey on the inferior application; but if before the return of survey, the holder of the preferable application accounts for his delay, the surveyor may and ought to make the return for him.*

THIS was an appeal from a decision of Mr. Justice *Brackenridge*, at a circuit court for *Centre* county, in *June* 1808.

The plaintiff claimed the land in question under two applications for 300 acres each; one, in the name of *John Burns*, dated the 3d of *April* 1769, No. 1544; the other, in the name of *Roger Flahavan*, of the same date, No. 1124. The former application called for land in the long *Limestone Valley*, where the Indian or trader's path passes from the *Bald Eagle's Nest* to *Frankstown*, including a limestone spring near *Alexander Robinson's*. The latter called for lands in the same valley, " near lands of *John Burns*."

On each of these applications a survey was made by the late Judge *Smith*, then deputy surveyor of the district, on the 24th *October* 1770; but although the land surveyed was in the same valley with the land called for, the description was a bad one.

When these surveys were returned, was not shewn to the jury; but on the 4th of *September* 1783, *Margaret Duncan*, the lessor of the plaintiff, to whom a moiety of each had been previously conveyed, paid the purchase money and obtained a patent.

The defendants were tenants of *George Robinson* junior, who claimed under an application in his name dated the 3d of *April* 1769, No. 471, for 300 acres on the north side of the *Bald Eagle* creek, upon the head waters of the *Biglick* run. Although this was a loose description of the land in question, yet it was in proof that it was intended for this land by the person who furnished the description to *Robinson's* father.

Upon this application, only seven shillings, the fees of office, were paid. It was delivered in the spring of 1770, by counts for his delay, the surveyor *may* and *ought* to make the return for him.

After a return made in favour of the holder of an inferior application, the holder of the application originally intitled to a preference may enter a caveat, and try his case before the board of property, who if there has been no unreasonable delay may order a patent to the caveator; and in case either party is dissatisfied he may bring his case before a court of law, where the order of the board of property is not considered as conclusive.

*George Robinson* the elder to *Charles Lukens*, to be surveyed; for although *Thomas Smith* was the deputy surveyor of the district, where the land lay, yet the surveys of *Lukens* within the same district had been recognised. *Lukens* promised to make the survey, and appointed a day to meet *Robinson* on the ground, but did not come. One *M'Donald*, the man who furnished the description to *Robinson*, and who was employed by him to shew the land to *Lukens*, then applied to Mr. *Smith* to make a survey; and the latter being assured that the order of survey was in the hands of *Lukens*, made a survey in *June* 1770 at a place shewn to him, but at some distance from the land in dispute. This survey however was not returned; for *Robinson*, upon learning from *M'Donald* where the survey was made, declared it was not in the right place, and that he would not have it; but in the year 1775 *Robinson* applied to *Lewis Lewis* the assistant deputy surveyor of the district, and got him to make a survey of the land in the ejectment. He then took possession of the premises, and continued there until the bringing of this action; but never obtained a return of the survey into office, until the year 1797.

1810.

Lessee of
DUNCAN
*v.*
CURRY.

Upon this evidence *Brackenridge* J. charged the jury as follows:

The applications of the plaintiff are both of the 3d of *April* 1769; that of *Flahavan*, No. 1124, and that of *Burns*, No. 1544.

The application of the defendants is of the 3d of *April* 1769, No. 471.

Thus the application of the defendants is intitled to the preference in point of number, which depends on the conditions of the opening of the office for the sale of these lands.

Which of these applications, those on the part of the plaintiff, or that on the part of the defendants, is the most appropriate to the ground in controversy, is a matter of fact for the jury.

One appropriate has a preference over one not appropriate; because for the one there is an order of survey, and preceding grant. In the other it is acceptance only, that by relation and confirmation can ratify the survey made.

But the earlier number not being put into the hands of the

surveyor, before the survey made on the later number, it loses its preference; and the more appropriate not being put into the hands of the surveyor before the survey made on the less appropriate, loses *its* preference. That is, the earlier number, and the more appropriate lose their preference of having their survey made; but the preference is lost no further than respects the making the survey. The right of preference may be brought before the surveyor at any time before the return, and claiming the preference and accounting satisfactorily for not coming forward and claiming it before, he may have the return. This not being done before the return, the preference is lost so far as respects the right of having the return made; but after the return the right of preference is not wholly gone. It may be brought before what is called the board of property, and this preference of claim decided on. Even where the board of property decide on the right of preference, the right is not wholly gone, for it may be tried at law. But in case even where the application is less appropriate, or where it is the later number, or where it is both, but was the only one put into the hands of the officer to survey upon, the only one he was called upon to return, or where there was no caveat or call before the board, and under these circumstances a patent is issued, it is too late to talk of a preference in a court of law. It might have been that had the party come forward and shewn his rights, the opposite claim might have been withdrawn. But where the other party, hearing nothing of an opposite claim, is led to pay the purchase money, I think it ought to conclude.

The present case is of that nature. The applications of the plaintiff, even supposing them to be the less appropriate, as they are certainly later numbers, have the advantage of the defendants' application, which did not come forward to the surveyor, either before the survey made, or after the survey and before the return.

It cannot be heard from a party that he did not hear of the survey of an adversary order, made or returned, so as to object to it; for what is done by public officers, and the records of a public office, must be known to all people, or considered to be known. It is what the law calls constructive notice, and binds equally with actual. I must therefore conclude notice,

and by non-claim the right of preference is waived. I do not think it necessary to lay stress upon the point of actual notice, which was the case, as may be collected from the testimony. The claim of the defendants therefore, on the ground of office right, would seem to be gone.

These principles I deduce from the conditions by the late proprietaries of the soil, annexed to grants of this nature; from the regulations of the proprietary office in carrying these grants into effect; from acts of assembly since the commonwealth succeeded to the estate of the late proprietary; from the regulations of the land office since; from the knowledge I have of the principles adopted and sanctioned by courts of justice; from my own ideas of justice between individuals, and ideas of public convenience and the general interest of the community. If these principles are correct, it remains to apply them to the case before us, to weigh the reason and justice of the present case on grounds of natural equity and principles of public safety.

Let us then take up the circumstances of this case a little from the testimony, and weigh them.

His honour then stated to the jury the manner in which the evidence was affected by these principles of law, expressing a pretty strong opinion in favour of the plaintiff; and the jury accordingly found their verdict. A motion was then made by the defendants for a new trial, upon the ground of misdirection, which was overruled, and an appeal made to this court.

The argument here by *Huston* for the plaintiff, and by *Watts* and *Duncan* for the defendants, turned principally upon the evidence, which it is unnecessary further to detail. The misdirection was said to consist in the application of the principles stated by his honour, to the facts of the case; but as no memorandum of the charge was preserved, except what is above given, it will be observed by the opinions of the court, that they take no notice of any thing but the principles themselves as general rules, and the merits of the application for a new trial, as they appeared from the facts reported.

VOL. III.                    C

TILGHMAN C. J. The defendants in this case moved for a new trial, on the ground of a misdirection in point of law by the judge of the Circuit Court before whom the cause was tried. It is to be regretted that the counsel, who took down the judge's charge, have omitted a material part of it. In the course of the charge, it appears that the judge laid down some general principles with regard to warrants, applications, and surveys. They are to the following effect

1. That between two applications entered 3d *April* 1769, commonly called *lottery applications*, because the preference was decided by *lottery*, that which came out of the wheel *first*, and was *lowest* in number, had the preference.

2. That the jury were to decide, as a matter of fact, which of the two applications was most descriptive of the land in dispute, or whether either of them could be properly applied to that land.

3. That an application descriptive of the land, is to be preferred to one not descriptive of it, though such descriptive application is higher in number, provided due diligence is used in obtaining a survey.

4. That if the holder of the application intitled to the preference, does not put it into the hands of a surveyor, and the holder of the other inferior application puts it into the surveyor's hands, in such case the surveyor may make the survey on the inferior application; but still, if the holder of the application originally intitled to the preference comes forward before the return of survey, and accounts satisfactorily for his delay, the surveyor *may* and *ought* to make the return for him.

5. That after a return made in favour of the holder of the inferior application, the holder of the application originally intitled to preference, may enter a caveat in the land office, and bring his case before the board of property, who if they are of opinion that there has been no unreasonable delay, may order a patent to the caveator.

6. That after all these proceedings either party may bring the case before a court of justice, where the decision of the board of property is not considered as conclusive.

I think these general principles are not to be denied, though like other general rules, they are subject to exceptions. The

*judge* having laid down these principles, proceeded as follows: " If these principles are correct, it remains to apply " them to the case before us; to weigh the reason and justice " of the present case, on grounds of natural equity and prin- " ciples of public safety. Let us then take up the circum- " stances of this case from the testimony, and weigh them." Here the charge breaks off abruptly, and it is impossible for this court to say, whether on the whole there was misdirection in point of law or not. It was in the power of the defendants' counsel, to have taken a bill of exceptions to the charge, or to have requested the judge to reduce it to writing according to the act of assembly, and in either case, we should have had every thing which was objected to, on the record. We cannot presume that there has been a misdirection, in order to avoid the verdict of the jury. But as a motion for a new trial is an appeal to the discretion of the court, it is proper that we should consider whether, from the report of the evidence which has been made, any injustice has been done to the defendants.

They claim under an application dated 3d *April* 1769, No. 471, which to make the best of it, contains but a vague description, and might be applied to other spots, as well as to the land in dispute. For this application *George Robinson* esquire paid 7s. the fees of office, but he paid no part of the purchase money. The land was in the district of *Thomas Smith* esquire; but it was proved, that *Charles Lukens* sometimes executed warrants within Mr. *Smith's* district. *Robinson* applied to *Lukens* to make a survey on his application; and it is probable that the order for survey was put into *Lukens's* hands in the spring, or early part of the summer 1770. *Lukens* promised to make the survey, and appointed a time, but failed in his appointment. Thus far the party may be said to have used due diligence. About the month of *June* 1770, one *M'Donald*, who had furnished *Robinson* with the description by which he entered his application, and who was employed by him to show the land to *Lukens*, applied to *T. Smith* to make a survey. *Smith*, being assured by *M'Donald* or one *Dick* who was with him, that the order of survey was in *Lukens's* hands, made a survey in the place shown to him, at some distance from the land in dispute. This survey was

never returned, because *Robinson*, on being told by *M'Donald* in what place it was made, declared it was not the right place, and he would not have it. But it does not appear that he applied again to Mr. *Smith*, or informed him that there was a mistake in the survey which he had made. On the 24th *October* 1770, *T. Smith* surveyed the land in dispute on an application in the name of *John Burns* dated 3d *April* 1769, No. 1544. In the year 1775, *Robinson* applied to one *Lewis Lewis*, an assistant of the deputy surveyor of the district, and got a survey made on his application, which was not returned till the year 1797. In the mean time *Margaret Duncan* the plaintiff became the owner of the survey made on the application in the name of *Burns*, and in the year 1783, paid the purchase money and obtained a patent from the commonwealth. Under all these circumstances, it appears to me, that *Robinson*, under whom the defendants claim, has not prosecuted his application with reasonable diligence. On the contrary he has been guilty of very great delay. He ought to have come forward, and demanded a survey on the spot for which he contended, as soon as he was informed of the survey made by Mr. *Smith;* he should have entered a caveat in the land office, against the survey made on *Burns's* application. If this had been done, and he had proved his claim to be just, *Burns's* application might have been surveyed in some other place. But by *Robinson's* lying by, Mrs. *Duncan* was induced to pay her money and take out a patent. She has paid the full purchase money. *Robinson* paid nothing. So far from the defendants' being wronged by the verdict, I think the law and justice of the case are both strongly with the plaintiff. My opinion therefore is that the judgment of the Circuit Court be affirmed.

YEATES J. I have seen the opinion which has been delivered by the Chief Justice, and entirely concur therein. I also agree to the general principles of the judge who tried the cause, respecting the legal operation of locations, upon the opening of the land office on the 3d *April* 1769. Applications, which do not exclusively call for particular spots of land, were never deemed efficacious to give a title to lands, unless they were reduced to certainty by a survey.

They have been called the mere expressions of a will to take up lands; but they have never been construed as contracts binding on either party, when standing alone. Titles will relate back to the applications when followed up with due diligence: but it would be unreasonable and unjust, that indescriptive early locations should prevent the settlement of the country, by being kept in the back ground. Later orders of survey duly prosecuted, though equally indescriptive, will be intitled to a preference over them. The intention of the party is of no avail, as to the lands he applies for, unless that intention is apparent on the face of his application, and becomes thereby unequivocal notice to other appliers. This point has been often decided. I consider the principles laid down on the trial, as referrible to the circumstances of the case then trying, and not settling the different branches of a system, which was to govern all future cases. A location is a good inception of title, but it may be abandoned either wholly or partially. Evidence of this abandonment is generally submitted to the decision of the jury; but it may often happen, that instances may occur of such abandonment, wherein the court may feel no difficulty in giving their sentiments to the jury, that the gross delay and *laches* of the party were conclusive on him. This happened in *Power's Lessee* v. *Hepburn*, and *Duncan's Lessee* v. *Wallis*, cited on the argument; and in many other cases.

It clearly appears from the testimony, that the lands in question fell within the district of *Thomas Smith* esquire, and to him application was made to execute the order in *June* 1770. *Alexander M'Donald* swears, that he was appointed to shew the deputy surveyor the lands. If such was the truth of the case, and the survey was made according to his instructions, it would be binding on the holder of the location. But admitting the fact to be otherwise, for which I see no reason, then the deputy surveyor was constituted his agent, and he was bound by his acts, if he acquiesced in them. When *Robinson* was informed by *M'Donald* of the survey which had been made, on his behalf, he was indispensably bound to apply to Mr. *Smith*, to rectify the supposed mistake of the call in his order, and to execute the same according to his ideas of the location. If Mr. *Smith*

1810.

Lessee of
DUNCAN
*v.*
CURRY.

refused or neglected to comply with this requisition, he might have applied to the surveyor general for a special order of survey to some other person; or he might state his case to the board of property, for their interposition; or if a survey had been made on the lands he contended for, under an adverse right, he might caveat the return and acceptance thereof, and thus obtain a fair hearing of his pretensions. Some step of this nature he should have pursued without delay. Negligence and *laches* were fatal to his interests, and have uniformly been so held: unless he followed up his pretensions with vigilance, he could not claim the benefit of a contract, and the common welfare imperiously demanded, that he should be postponed. But how did *Robinson* prosecute his claim in the present instance? He first waits five years, before he obtains a survey to be made by *Lewis Lewis*, and then delays the return thereof for twenty-two years longer until 1797. In the mean while, in 1783, the lessor of the plaintiff pays the full purchase money, and obtains the legal title, under the survey made on the application of *Burns* on the 24th *October* 1770, without any notice of an adverse claim. I see no merits in the case of the defendants, nor misdirection on the part of the judge of the Circuit Court, and am therefore clearly of opinion, that no new trial should be granted, under all the circumstances of the case.

New trial refused, and<br>Judgment affirmed.